IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ERIC A. GRIFFIN, A Minor Child; <br><br> Plaintiff, <br><br> vs. <br><br> CAROLYN W. COLVIN, Acting Commissioner of Social Security; <br><br> Defendant. | **8:13CV365** <br><br> **MEMORANDUM AND ORDER** |

Plaintiff Eric A. Griffin ("Griffin"), a child under the age of 18, seeks review of the decision by the defendant, Carolyn W. Colvin, Commissioner of the Social Security Administration (the "Commissioner"), denying his application for disability benefits under Title XVI of the Social Security Act.  Social Security Transcript ("TR") at 12-25.  After carefully reviewing the record, the Commissioner's decision will be reversed and remanded for proceedings consistent with this Order.

## I. PROCEDURAL BACKGROUND

Griffin, by and through his legal guardian, protectively filed for SSI disability benefits on December 3, 2010. (TR. 60).  The application was denied on March 3, 2011. (TR. 63).  Plaintiff requested reconsideration and that request was denied on July 21, 2011. (TR. 67 & 71).  Plaintiff requested a hearing.  A hearing was held before an Administrative Law Judge ("ALJ") on September 13, 2012. (TR. 31).  The ALJ issued a written decision determining Griffin was not disabled. (TR. 12-25).  Plaintiff timely filed a Request for Review of the ALJ's decision.  The Appeals Council denied the request on October 22, 2013. (T.1).  Plaintiff now appeals from that decision.

## II.     THE ALJ's DECISION

The ALJ evaluated Griffin's claim through the three-step sequential evaluation process to determine whether Griffin – an individual under the age of 18 – was disabled. See 20 CFR 416.924(a). As reflected in his decision, the ALJ made the following findings:

1. The claimant was born on October 23, 2004. Therefore, he was a school-age child on December 3, 2010, the date the application was protectively filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2. The claimant has not engaged in substantial gainful activity since December 3, 2010, the protective filing date of the application (20 CFR 416.924(h) and 416.971 et seq.).

3. The claimant has the following severe impairments: Hearing loss on the right; and attention-deficit hyperactivity disorder ("ADHD") (20 CFR 416.924(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of a listing (20 CFR 416.924(d) and 416.926a).

6. The claimant has not been disabled, as defined in the Social Security Act, since December 3, 2010, the date the application was protectively filed (20 CFR 416.924(a)).

(TR. 15-25).

### III. ISSUES RAISED FOR JUDICIAL REVIEW

Griffin's complaint requests judicial review of the ALJ's decision. He raises the following arguments in support of his claim for reversal.[1]

1) The ALJ erred by failing to have a qualified medical expert testify regarding the claimant's ADHD to determine whether Griffin had an impairment that met or equaled the severity of one of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

2) The ALJ abused his discretion and erred in failing to give sufficient weight to claimant's treating medical provider.

3) The ALJ erred by ignoring substantial evidence that supports the treating physician's opinion.

### IV. THE RECORD AND PROCEEDINGS BEFORE THE ALJ

The Claimant was six years old and in kindergarten when his grandmother and legal guardian, Terri Hoskins, applied for SSI benefits based on childhood disability.

---

[1] Griffin did not submit arguments regarding whether Griffin's hearing loss constitutes a disability for the purposes of SSI. Accordingly, the court will not address that issue.

Hoskins protectively filed the application on Griffin's behalf on December 3, 2010. (TR. 153, 110, and 106). Plaintiff alleges an onset date of October 25, 2010. (TR. 107). The alleged disability is due to Griffin's ADHD, complete hearing loss in his right ear, and partial hearing loss in his left ear. (TR. 136). Griffin was a school-age child during the relevant time period. See, e.g., 20 C.F.R. § 416.926a(g)(2)(iv).

Plaintiff's treating physician is Dr. Robert Drvol. On September 16, 2010, Griffin saw Dr. Drvol because Griffin was having difficulty at school and staying on task. (TR. 424). Dr. Drvol's notes also reflect that Hoskins was concerned because Griffin was "wild," "inattentive," and "never sits still." (TR. 424). Dr. Drvol diagnosed Griffin with ADHD and prescribed Concerta. (TR. 424). On October 19, 2010, Griffin visited Dr. Drvol again. (TR. 423). Dr. Drvol's notes indicate Griffin was "doing better" with his ADHD and that his teachers reported he was "much improved." (TR. 423). However, when Griffin ran out of medication, he experienced an increase in "bad behavior." (TR. 423). Dr. Drvol opined that Griffin would benefit from an increase in dosage of his ADHD medication and wrote a prescription accordingly. (TR. 423).

At a November 18, 2010 appointment, Dr. Drvol again indicated Griffin's behavior was improved at school. (TR. 421). But Dr. Drvol noted that Griffin's weight had decreased and Griffin was not eating well. (TR. 421). He further noted that the eating problem was chronic and predated the time Griffin began taking medicine, but that if the weight loss continued, Griffin may need to stop taking Concerta. (TR. 421).

Griffin apparently stopped taking his medication due to concerns with his lack of appetite and weight loss. During a visit with Dr. Drvol on January 18, 2011, Dr. Drvol noted that since Griffin was off Concerta, Griffin had gained weight, but his behavior was "much worse." (TR. 469). He was "not staying on task" and doing "poorly in school." (TR. 469). Dr. Drvol apparently prescribed Strattera at that time, but Griffin's insurance

4

would not cover the cost of the new medication. (TR. 469-70). Dr. Drvol then prescribed Adderal. (TR. 465).

In December of 2011, Dr. Drvol reported that Griffin was having "trouble at school," was "very hyper," and was "behind and doesn't complete assignments." (TR. 596). Dr. Drvol recommended that he begin taking Concerta again. (TR. 596). In January of 2012, Dr. Drvol noted the Concerta was "working tremendously," but Griffin was still losing weight and was still struggling with activities of daily living ("ADLs") such as tying his own shoes and properly writing letters and numbers. (TR. 595). He further noted that Griffin reported trouble getting to sleep at night. (TR. 595).

Griffin visited Dr. Drvol yet again on March 8, 2012. (TR. 591). At that time Griffin had stopped taking the Concerta due to headaches and weight loss. Dr. Drvol noted that his behavior was only "ok" since discontinuing use of Concerta, but that Griffin had gained weight and stopped having headaches. (TR. 591). Dr. Drvol ordered Griffin to stay off medication until directed otherwise. (TR. 593).

In January of 2011, Griffin's kindergarten teacher, Adele Klima, completed a questionnaire about Griffin's functional abilities. (TR. 153-60). The assessment was divided into five categories assessing Griffin's behavior: (I) Acquiring and Using Information; (II) Attending and Completing Tasks; (III) Interacting and Relating with Others; (IV) Moving About and Manipulating Objects; (V) Caring for Himself or Herself. Klima was asked to rate Griffin's behaviors within these categories on a scale of 1 to 5, with "1" representing "no problem;" "2" representing a "slight problem;" "3" representing "an obvious problem;" "4" representing a "serious problem," and "5" representing a "very serious problem." (TR. 153-60).

5

With respect to "Acquiring and Using Information," Klima noted Griffin had a "serious problem" with comprehending and doing math problems and expressing ideas in written form. (TR. 154). She identified at least two other areas that she considered "obvious problems" and one area that fluctuated between a "slight problem" and a "very serious problem." Klima also commented:

> When Eric is not medicated (for ADHD) he has difficulty completing independent work. My para and I work with him in close proximity as much as possible (<u>daily</u>). I notice he cannot stay focused on tasks at all, when not in direct proximity to an adult. . . . He is, at this time, my second oldest student, and one of my least mature.

(TR.154)(emphasis in original).

With respect to the second category, "Attending and Completing Tasks," Klima identified four areas as "very serious problems" including: carrying out multi-step instructions, changing from one activity to another without being disruptive, working without distracting himself or others, and working at a reasonable pace/finishing on time. (TR. 155). In addition, she identified five other categories as "serious problems" including: focusing long enough to finish an assigned activity or task, refocusing to task when necessary, carrying out single-step instructions, organizing his own things or school materials, and completing work accurately without careless mistakes. She qualified that her answers were based on his actions when he was not on medication for his ADHD. (TR. 155).

With respect to the third category, Interacting and Relating with Others, Klima indicated that Griffin had a "very serious problem" with taking turns in conversation, and behavior modification strategies did not work. (TR. 156). She further noted that Griffin "is not independent with assigned tasks except work on the computer (he has particular

problems with writing activities)." (TR. 156). She again indicated that this was a problem when Griffin was not taking ADHD medicine. (TR. 156).

In the fourth category, "Moving About and Manipulating Objects," Klima reported that Griffin had a "very serious problem" with integrating sensory input with motor output. (TR. 157). And she stated Griffin had a "serious problem" with moving from one place to another, managing pace of physical activities or tasks, and showing a sense of his body's location and movement in space. (TR. 157). She noted "Eric <u>exaggerates</u> all we do. He swings his arms, hops too hard, get in another's space. (Because he is so small and very charming, his classmates readily forgive his intrusions)." (TR. 157)(emphasis in original).

Klima noted no problems with the fifth category, "Caring for Himself." (TR. 158). In conclusion she stated: "Medication has been prescribed for Eric by his doctor. He is a <u>very</u> different child when he takes it. He still has difficulty writing and makes careless mistakes in math. However his grandmother was concerned about his losing weight." (TR. 157)(emphasis in original).

On February 7, 2011, Daniel Fudge, Ph.D. performed a consultative psychological examination. (TR. 436-40). Griffin was taking Concerta at that time of Dr. Fudge's examination. (TR. 437). Dr. Fudge noted that "Griffin's intellect, emotional responses, personality, daily activities, and memory are not affected by his ADHD." (TR. 437). But, Griffin "did appear to be hyper and had to be redirected several times during the evaluation." (TR. 438). Dr. Fudge opined that Griffin "should be able to concentrate and sustain attention for two-step directions; however, he may have problems with more complicated procedures. There are no other functional limitations that he presents with." (TR. 438).

State agency consultants Christine Wright, M.D. and Patricia Newman, Ph.D., evaluated the record evidence and concluded that Griffin had severe impairments of hearing loss and ADHD, but was not disabled. (TR. 442-48). This opinion was based primarily on Dr. Fudge's evaluation and the reports from Griffin's teacher stating Griffin was better behaved, and was "progressing" in reading and math when his ADHD was controlled by medication. Drs. Wright and Newman acknowledged that Griffin did not take his medication regularly. (TR. 447).

On May 11, 2011 the Omaha Public Schools issued an Evaluation Report at the request of the Student Assistance Team to determine if Griffin met the Nebraska Department of Education eligibility requirement for special education services and to prepare an Individual Education Plan ("IEP") for Griffin. (TR.332). Kyle Hesser, a school psychologist conducted the evaluation. (TR. 335). Griffin took the Wechsler Nonverbal Scale of Ability Test and ranked in the fifth percentile. (TR. 332). Hessler's notes reflect the following:

> Eric's cognitive ability was measured in the Borderline range for his age. However, the results should be interpreted with caution due to Eric's young age and effort. Eric was engaged in the activities but he was fidgety, talkative, and easily distracted. For example, during the timed subtest that measures processing speed, Eric would work for a few seconds then stop to say something. The examiner had to prompt him to look at the next test item because Eric would get lost or start items at random. Although the results are likely an underestimation of Eric's actual cognitive ability, he demonstrated appropriate visual recognition, or visual memory skills. It is likely that Eric has low-average or average ability but his inattention and hyperactivity clearly inhibited his performance, even in the highly-structured environment.

(TR. 332).

Hessler also observed Griffin in the classroom setting and reported:

> The School Psychologist observed Eric during their opening activities on April 13. Students were seated on the carpet and were engaged in opening activities such as calendar, Eric was frequently off task and needed to be redirected 11 times during the 15 minute observation period. Most redirections were for talking out. Eric spoke out 13 times during the observation period. Although his teacher had to redirect him more than others, she also provided him more praise than other students. His teacher reported that the behaviors displayed during the observation period were typical. The observed classroom behaviors were observed at other times and in other environments too. Just prior to the observation period, Eric had to be separated from the class in the hallway during a restroom break for not keeping his hands to himself. Eric argued with the teacher after being redirected. During testing, Eric was fidgety, frequently spoke out of turn about anything (on- or off-topic), and he had difficulty waiting his turn to do or say something.

(TR. 333).

Hessler opined that "Eric's medical condition significantly impacts his ability to attend to instruction and lessons. It also impairs his ability to practice new skills and complete assignments independently." (TR. 334). In recommending special education services, Hessler stated "Eric's inattention and hyperactivity significantly impacts his progress through the general education curriculum. He will require more intense instruction and additional support." (TR. 334-5).

Additional agency consultants – Thomas Calvert, M.D., Glenda Cottam, Ph.D., and certified speech pathologist Terry Vontz– reviewed the evidence of record and concluded that Griffin had less than marked limitations in all the functional domains. (TR. 473, 475). The consultants relied heavily upon the opinion of Dr. Fudge. (TR. 473-77).

At the hearing, the only medical professional that testified was Dr. Kendrick Morrison, an otorhinolaryngologist. (TR. 38). And his testimony related specifically to Griffin's hearing loss, which is not at issue in Griffin's appeal. The ALJ also elicited testimony from Griffin and Hoskins. Hoskins testified that Griffin was disruptive in school and did not stay on task for very long. (TR. 50). She also explained that Griffin had been prescribed "four or five" different types of medications for his ADHD, but that Dr. Drvol "[took] him off each one" because Griffin wouldn't eat, was losing weight and experienced headaches. (TR. 53). She also noted Griffin had been disciplined several times for disrupting class. (TR. 54). Hoskins also testified Griffin has great difficulty staying on task and she had to help Griffin with his homework every night for an hour. (TR. 54). Hoskins explained that Griffin needed assistance with zipping up his clothes and tying his shoes. (TR. 55-56). Hoskins further explained that Griffin required one-on-one attention at school and worked with a "specialist" at school on his behavior and academic work. (TR. 57). Finally, she testified that his doctor felt the ADHD medicine was causing more harm than good to Griffin. (TR. 58).

After the ALJ issued his unfavorable decision, Griffin obtained a questionnaire opinion from his treating physician Dr. Drvol. In the opinion, dated October 8, 2012, Dr. Drvol opined that Griffin had marked limitations in two functional domains: acquiring and using information and attending and completing tasks. (TR. 608-10). This evidence was submitted to the Appeals Council.

## VI. LEGAL ANALYSIS

A denial of benefits by the Commissioner is reviewed to determine whether the denial is supported by substantial evidence on the record as a whole. Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001).

> If substantial evidence on the record as a whole supports the Commissioner's decision, it must be affirmed. Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006). "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006) (quoting Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "The ALJ is in the best position to gauge the credibility of testimony and is granted deference in that regard." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).

Schultz v. Astrue, 479 F.3d 979, 982 (8th Cir. 2007). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. Wildman v. Astrue, 596 F. 3d 959 (8th Cir. 2010). The court should not overturn an ALJ's decision so long as it is in the "zone of choice" even if the court disagrees with the ALJ's conclusion. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).

For a child to be considered disabled for the purposes of SSI, the child must either meet a listed impairment or have a "medically determinable physical or mental impairment, which results in marked and severe functional limitations" and those limitations must either last, or be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i).

### A. Development of the Record

Griffin asserts the ALJ failed to properly develop the record to determine if Griffin met a listed impairment. That is, he argues the ALJ should have called a medical expert to testify regarding Griffin's ADHD symptoms when Griffin was not taking medication. To decide if a case should be remanded because the ALJ failed to fully develop the record, the court must consider whether the claimant was prejudiced. Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993). The ALJ must typically seek additional medical evidence in the form of examinations or consultations when the record does not contain

11

enough information for the ALJ to make an informed decision. See, e.g., Boyd v. Sullivan, 960 F.2d 733, 736 (1992) (ALJ should have ordered a consultative examination when the record did not provide information on claimants emotional and mental problems).

In this case, the record provides ample evidence of Griffin's problems when he is unable to take his medication and the ALJ did not err by failing to call an additional medical expert. However, the ALJ's evaluation of whether Griffin's ADHD meets a listing deserved more than a cursory review. Section 112.11 contains the listing for ADHD.

> Attention Deficit Hyperactivity Disorder: Manifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
>
>> A.   Medically documented findings of all three of the following:
>>
>>> 1.   Marked inattention; and
>>>
>>> 2.   Marked impulsiveness; and
>>>
>>> 3.   Marked hyperactivity;
>
> AND
>
> for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

Paragraph B2 of 112.02 provides:

12

    2.    For children (age 3 to attainment of age 18), resulting in at least two of the following:

        a.    Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

        b.    Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

        c.    Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

        d.    Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

The ALJ's determination simply stated the "claimant's ADHD is not associated with marked inattention, marked impulsiveness, or marked hyperactivity." (TR. 15). However, "the severity of Plaintiff's ADHD deserves more than a conclusory sentence, especially because, when fully evaluated, the Plaintiff's ADHD may meet or medically equal in severity the criteria of a listed impairment." Pena v. Barnhart, case no. 01c504455, 2002 WL 31527202, *7 (N.D. Ill., November 13, 2002). The undersigned believes the evidence of record warrants a thorough analysis and discussion of Claimant's

13

symptoms – particularly since, as discussed below, Griffin was taken off his medication by his physician due to medication-related side effects which hinder his growth and overall health.

### B. The Functional Domains

Even if the ALJ determines Griffin does not meet a listing, the ALJ will need to reassess whether Griffin has an impairment or combination of impairments that functionally equals the severity of a listing. This requires the ALJ to analyze the child's functional limitations within six domains of functioning. See 20 C.F.R. §§ 416.924(d) and 416.926a. "We may find functional equivalency to a listed impairment if a child has an extreme limitation in at least one functional domain, or "marked" limitations in at least two such domains." Scales v. Barnhart, 363 F.3d 699, 703-04 (8th Cir. 2004).

The six functional categories are: (i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others, (iv) Moving about and manipulating objects, (v) Caring for yourself; and (vi) Health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

The applicable regulations discuss what should be considered a "marked" limitation in evaluating the child's performance in the six functional categories.

> (i) We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

14

20 C.F.R. § 416.926a(2).

In this case, the ALJ reviewed each of the six functional domains and determined Griffin had "less than marked" limitations in each. Griffin argues the ALJ's finding is erroneous for two of the functional domains – "acquiring and using information" and "attending and completing tasks." (Filing No. 16 at CM/ECF pp. 16-19).

Before addressing the specific functional domains at issue, it is important to note that the linchpin of the ALJ's decision appears to be the opinion of Dr. Fudge, to which the ALJ afforded "great weight." However, Dr. Fudge completed his evaluation of Griffin while Griffin was taking his ADHD medication. (TR. 437). The opinions of the state agency consultants upon which the ALJ relied suffer the same flaw because they rely heavily upon Dr. Fudge's evaluation. However, the record is clear that Griffin was on ADHD medications for only a limited time due to unfavorable side effects – loss of appetite, weight loss, and headaches.[2] And when Griffin was unable to take his ADHD medications his behavior and functional capacity decreased significantly.

    1.    <u>Acquiring and Using Information</u>

The ALJ determined Griffin did not suffer marked limitations in the area of "acquiring and using information." This domain involves how children "learn to read, write, and do math, and discuss history and science." 20 C.F.R. § 416.926a(g)(2)(iv). Dr. Fudge concluded "[t]he psychological assessment indicated mild to moderate challenges in several areas: However, there is no indication of any marked mental health

---

[2] Griffin did not stop taking his medication arbitrarily or due to forgetfulness. Rather, he experienced severe side effects that were both objective and subjective in nature. The medication caused loss of appetite, sleep, and headaches, with an objective manifestation of weight loss when Griffin was on the medication and weight gain when he was not. Griffin stopped taking his ADHD medicine upon both the approval and recommendation of his treating physician. (TR 593).

15

challenges at this time." (TR. 477). Relying heavily on Dr. Fudge's conclusions, the state agency consultants determined Griffin's limitation in this area was "less than marked,' (TR. 473), with Drs. Wright and Newman specifically noting that Griffin does better on medication, (TR. 444-47). These conclusions are supported by Griffin's third quarter report card which indicated he was "progressing," and an IEP evaluation which stated he "demonstrated appropriate visual recognition, or visual memory skills." (TR. 20-21 and TR. 332). Finally, the ALJ noted that when completing the questionnaire addressing Griffin's functional abilities, his teacher, Klima, did not indicate Griffin had a "very serious" problem with any of tasks in the "acquiring and using information" category. (TR. 21 and TR. 154).

The ALJ's opinion regarding Griffin's ability to acquire and use information did not consider Griffin's limitations when Griffin is unable to take his medication. Klima explained that Griffin had a "serious problem" in comprehending and doing math problems and expressing ideas in written form, (TR. 154), sometimes had a "very serious problem" applying problem solving skills in class, (TR. 154), and has an "obvious problem" reading and comprehending written material and recalling and applying previously learned material when he was not taking his medication. (TR. 154). Although Griffin was "progressing" as reflected on his report card, "progressing" is defined as "Approaches but does not meet standards." (TR. 194). That is, through 3 academic quarters of his kindergarten year, Griffin had not yet met academic standards in reading, writing, or math. (TR. 195). For the first two quarters in math, he was not even approaching the academic standards. (TR. 195). The notes at the end of the second quarter state: "When [Griffin] is not having a good day, he cannot complete work correctly nor can he remain on task." (TR. 197).

Griffin's IEP evaluation results noted "limited progress" during his kindergarten year. (TR. 199). For example, Griffin remained in the "Beginning" reading group,

learned the fewest High Frequency words of any student in his class, had difficulty counting, and was not able to "write letters beyond 10" despite working with flash cards "three times a day." (TR. 199). The IEP evaluation also noted that Griffin "requires a lot of repetition for learning skills." (TR. 200).

Although the ALJ concludes the record as a whole indicated that "even without medication" Griffin's functional limitations are not of marked severity, (TR. 19), the analysis within the opinion, and the medical providers relied upon, focused on Griffin's ADHD symptoms while using medication. (TR. 19 and TR. 21). The ALJ did not consider Griffin's limitations when, upon the advice of his physician, he is unable to take ADHD medication. And, the ALJ did not address the records of Griffin's treating physician and largely discounted the information provided by his teacher and his IEP evaluation. (TR. 19). The ALJ also discounted the testimony of Griffin's grandmother despite the fact it was completely consistent with the reports of Griffin's teacher and his in-school evaluation. For all of these reasons, the record does not support the ALJ's conclusion that Griffin does not have at least a "marked limitation" in the acquiring and using information domain.

### 2. Attending and Completing Tasks

The ALJ determined Griffin had a "less than marked limitation" in the domain of "Attending and Completing Tasks." The ALJ's explanation for this determination, set forth hereafter in its entirety, states:

> In May 2011, it was reported that the claimant enjoyed listening to stories, loved learning new things, and responded well to redirection. (Exhibit 16E/12). Mrs. Klima rated the claimant's performance as most limited in this domain, but only when not taking medication. (Exhibit 5E/4) She noted certain problems that were occurring on an hourly basis, but the record as a

17

whole fails to establish marked limitations since the claimant's ADHD medication was most recently stopped.

(TR. 21).

The ALJ's opinion is not support by substantial evidence of record. For the reasons noted above, the ALJ relied too heavily on Griffin's behaviors and limitations while on medication. Klima reported significant limitations in this area when Griffin is not medicated. She noted four to five areas of "very serious problems" and five to six areas of "serious problems." (TR. 155). Specifically, Griffin experienced serious problems in:

- Carrying out multi-step instructions;
- Changing from one activity to another without being disruptive;
- Working without distracting self or others; and
- Working at a reasonable pace and finishing on time.

Klima reported "serious problems" in the following areas:

- Focusing long enough to finish assigned activity or task;
- Refocusing on task when necessary;
- Carrying out single-step instructions;
- Changing from one activity to another without being disruptive;
- Organizing own things or school materials; and
- Completing work accurately without careless mistakes.

(TR. 155).

Klima's noted that Griffin was able to complete tasks at school only if the teacher or para-educator was in close proximity. (TR. 155). And if he was not taking his

18

medication, Griffin could not stay focused on tasks "at all" and "ha[d] difficulty completing independent work."[3] (TR. 154). The disruptions occurred on a daily, and sometimes hourly basis. (TR. 155).

Other evidence of record indicates Griffin has at least a marked, if not an extreme, limitation in this area. For example, his IEP evaluation notes that the intellectual testing results were likely an underestimation of Griffin's ability, finding:

> Eric's cognitive ability was measured in the Borderline range for his age. However, the results should be interpreted with caution due to Eric's young age and effort. Eric was engaged in the activities but he was fidgety, talkative, and easily distracted. For example, during the timed subtest that measures processing speed, Eric would work for a few seconds then stop to say something. The examiner had to prompt him to look at the next test item because Eric would get lost or start items at random. Although the results are likely an underestimation of Eric's actual cognitive ability, he demonstrated appropriate visual recognition, or visual memory skills. It is likely that Eric has low-average or average ability but his inattention and hyperactivity clearly inhibited his performance, even in the highly-structured environment.

(TR. 332).

The observations within the IEP are consistent with the testimony of Hoskins, Griffin's grandmother, who explained Griffin's inability to stay on task and his disruptive behavior at school. (TR. 50, 54). Hoskins testified that Griffin's ability to learn is hindered because "he can't stay focused long enough to complete things." (TR. 54). She also testified that she has to help him complete his homework and that they spend an hour a night completing two pages because of his inability to focus and his perpetual desire to get up and move around. (TR. 54-55).

---

[3] Although these notes from Klima were under the "acquiring and using information" domain, the content is more consistent with the "attending and completing tasks" domain.

The ALJ's conclusory statement that "the record as a whole fails to establish marked limitations since the claimant's ADHD medication was most recently stopped" is not supported by the record. To the contrary, the record as a whole supports the opposite conclusion. For that reason, the case will be remanded for the ALJ to consider whether Griffin has not only a "marked" limitation in this domain, but also whether the limitation could be considered extreme.[4]

Accordingly,

IT IS ORDERED, that judgment shall be entered by separate document, providing that the Commissioner's decision is reversed and the case remanded for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).

Dated this 7th day of November, 2014.

BY THE COURT:

s/ Cheryl R. Zwart
United States Magistrate Judge

---

[4] "We will find that you have an 'extreme' limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. 'Extreme' limitation also means a limitation that is 'more than marked.' 'Extreme' limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." 20 C.F.R. § 416.926a(e)(3).

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.